UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____ **07-21543**

**CIV-HOEVELER**
**MAGISTRATE JUDGE**
**BROWN**

CARNIVAL CORPORATION and CARNIVAL PLC,

        Plaintiffs,

v.

INDUSTRIAL RISK INSURERS, LEXINGTON
INSURANCE COMPANY, COMMONWEALTH
INSURANCE COMPANY, ARCH SPECIALTY
INSURANCE COMPANY, GENERAL SECURITY
INDEMNITY COMPANY OF ARIZONA, SCOR
REINSURANCE COMPANY, ILLINOIS UNION
INSURANCE COMPANY, ESSEX INSURANCE
COMPANY, and MARSH USA INC.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## COMPLAINT AND JURY DEMAND

    Plaintiffs Carnival Corporation and Carnival PLC (collectively, "Carnival") by their attorneys, Coffey Burlington PL, hereby file this complaint against defendants, and allege as follows:

### NATURE OF THIS ACTION

    1.    Carnival seeks a comprehensive declaration of the rights, duties, and liabilities of the defendant insurance companies (collectively, the "Insurance Company Defendants") under global, all-risk, first-party property insurance policies that Carnival purchased from them, which were in effect from May 2005 through May 2006.

    2.    Carnival also seeks damages from certain Insurance Company Defendants for breach of contract, under Carnival's global, all-risk, first-party property insurance policies, for

refusing to pay Carnival in full for its losses and other damages arising out of Hurricane Wilma (the "Hurricane Wilma Losses").

      3.     Carnival also seeks damages from its insurance broker, Marsh USA Inc. ("Marsh") to the extent that Carnival does not receive full coverage for its losses alleged herein and for all costs and expenses it incurs in pursuing its rights to such coverage based upon breach of contract, breach of fiduciary duty, and negligence for (1) failing to procure adequately and appropriately the global, all-risk, first-party property insurance coverage requested by Carnival (to the extent Carnival's alleged coverage rights are not upheld), (2) failing to take adequate, appropriate, and reasonable steps necessary to ensure that Carnival and the Insurance Company Defendants had a clear understanding and were in agreement regarding the scope of coverage afforded by the global, all-risk, first-party property insurance policies, (3) failing to warn Carnival adequately and appropriately that the insurance coverage it procured was different from that which Carnival had requested be procured (to the extent Carnival's alleged coverage rights are not upheld), (4) assuring Carnival that it had provided Carnival with the coverage Carnival required and requested, when in fact Marsh did not secure such coverage (to the extent Carnival's alleged coverage rights are not upheld), and/or (5) failing to take necessary and appropriate steps to ensure that Carnival would not need to enforce its contractual rights to coverage through dispute resolution, which required Carnival to incur significant fees and expenses.

      4.     Carnival thus seeks damages from Marsh for (1) all Hurricane Wilma Losses that the Court finds are not covered by the insurance policies sold by the Insurance Company Defendants, and (2) all of Carnival's costs, expenses, and losses in connection with its efforts to seek recovery under the insurance policies sold by the Insurance Company Defendants, and to

defend against the Insurance Company Defendants' positions regarding coverage for Carnival's Hurricane Wilma Losses.

## PARTIES

5.       Plaintiff Carnival Corporation was and is a corporation organized and existing under the laws of Panama. Its principal place of business within the United States is located in Miami, Florida.

6.       Plaintiff Carnival PLC was and is a corporation organized and existing under the laws of England and Wales.

7.       Defendant Industrial Risk Insurers ("IRI") is a Connecticut corporation with its principal place of business in Avon, Connecticut. IRI is licensed to do business and is doing and transacting business in Florida.

8.       Defendant Lexington Insurance Company ("Lexington") is a Delaware corporation with its principal place of business in Boston, Massachusetts. Lexington is authorized to do business on a surplus lines basis and is doing and transacting business on that basis in Florida.

9.       Defendant Commonwealth Insurance Company ("Commonwealth") is incorporated and has its principal place of business in Vancouver, British Columbia, Canada. Commonwealth is authorized to do business on a surplus lines basis and is doing and transacting business on that basis in Florida.

10.       Defendant Arch Specialty Insurance Company ("Arch") is a Nebraska corporation with its principal place of business in New York, New York. Arch is authorized to do business on a surplus lines basis and is doing and transacting business on that basis in Florida.

11.       Defendant General Security Indemnity Company of Arizona ("General Security") is an Arizona corporation with its principal place of business in New York, New

York. General Security is authorized to do business on a surplus lines basis and is doing and transacting business on that basis in Florida. General Security is a wholly-owned subsidiary of SCOR Reinsurance Company; these two companies collectively are referred to herein as "SCOR/General Security."

12.     Defendant SCOR Reinsurance Company ("SCOR") is a New York corporation with its principal place of business in New York, New York. SCOR is authorized to do business as an accredited reinsurer and is doing and transacting business on that basis in Florida. SCOR is the parent company of General Security and is involved in adjusting Carnival's insurance losses at issue in this action. SCOR and General Security collectively are referred to herein as "SCOR/General Security."

13.     Defendant Illinois Union Insurance Company ("Illinois Union") is an Illinois corporation with its principal place of business in Philadelphia, Pennsylvania. Illinois Union is authorized to do business on a surplus lines basis and is doing and transacting business on that basis in Florida.

14.     Defendant Essex Insurance Company ("Essex") is a Delaware corporation with its principal place of business in Glen Allen, Virginia. Essex is authorized to do business on a surplus lines basis and is doing and transacting business on that basis in Florida.

15.     Defendant Marsh USA Inc. is a Delaware corporation with its principal place of business in New York, New York. Marsh is licensed to do business and is doing and transacting business in Florida.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because Carnival and the defendants are citizens of different states, and the amount in controversy, exclusive of interest, costs, and attorney's fees, exceeds $75,000.

17.     This Court has personal jurisdiction over all of the Insurance Company Defendants because each such defendant was authorized to do business in the State of Florida on either a general or surplus lines basis, or as an accredited reinsurer, within the time period relevant to the claims stated herein and/or has transacted or is transacting business in Florida.

18.     With the exception of Scor, this Court also has personal jurisdiction over all Insurance Company Defendants because they all contractually agreed to submit, at Carnival's request, to the jurisdiction of any court of competent jurisdiction in the United States, including this Court.

19.     This Court also has personal jurisdiction over Defendant Marsh because it contractually agreed to submit to the jurisdiction of any court located in Miami-Dade County, Florida, which is where this Court resides.

20.     This Court also has personal jurisdiction over all Defendants because the insurance policies at issue were sold by the Insurance Company Defendants, brokered by Defendant Marsh, and delivered to Carnival through Marsh in this judicial district.

21.     Venue is proper in this district under 28 U.S.C. § 1391 because the insurance policies at issue were sold by the Insurance Company Defendants, brokered by Defendant Marsh, and delivered to Carnival through Marsh in this judicial district.

## FACTUAL BACKGROUND

### Carnival Procures Its 2005-2006 Global, All-Risk, First-Party Property Insurance Program

22.     In the spring of 2005, Carnival sought to renew its global, all-risk, first-party property insurance program, including coverage for all of its properties in Mexico, with limits up to $150,000,000.

23.     Carnival hired Marsh to assist with the procurement of this coverage.

24.     Marsh is an insurance broker that holds itself out as being the world's leader in property risk management, offering superior insurance-market insight, global resources, and technical expertise to help its clients face the world of property risk successfully. Marsh claims to have hundreds of dedicated property professionals who serve nearly half of the *Fortune* 500 companies by providing unmatched advice and transactional capabilities. Marsh also maintains that it has specialized property expertise in every business and industry that impacts its clients.

25.     Carnival paid Marsh substantial fees to serve as its insurance broker and to help Carnival procure its 2005-2006 global, all-risk, first-party property insurance program renewal (the "Carnival Global Property Insurance Program"). Carnival and Marsh entered into a Client Service Agreement (the "Agreement"), which details the duties and responsibilities that Marsh agreed to assume in connection with procuring this coverage. A copy of the Agreement is attached to this Complaint as Exhibit A.

26.     Under the Agreement, Marsh promised, among other things:

a.      to work with Carnival to assess Carnival's risks;

b.      to work with Carnival to design and develop Carnival's insurance program;

c.      to help Carnival with the documentation and other steps to obtain commitments for and implement Carnival's global insurance program, and to perform these functions upon Carnival's instructions;

d.      to review the policies and endorsements for accuracy and conformity to specifications and negotiated coverage;

e.      to provide coverage summaries for all new coverage and updates on changes to existing coverage;

f.      to assist Carnival in connection with issues relating to interpretation of insurance policies placed by Marsh;

g.      to develop a mutually agreeable renewal action plan and timeline that highlights accountability and meets Carnival's objectives; and

h.   to provide all services in a professional and timely manner consistent with industry standards and in compliance with applicable laws.

27.   Marsh approached the insurance market, and procured, on Carnival's behalf, Carnival's 2005-2006 global, all-risk, first-party property insurance program, including coverage for Carnival's properties in Mexico.

28.   Carnival's 2005-2006 global, all-risk, first-party property insurance program, which consists of multiple insurance policies sold by the Insurance Company Defendants, covers the period of May 1, 2005 through May 1, 2006.  Carnival incorporates by reference herein each insurance policy.  Copies of these policies are not attached to this Complaint because the policies are voluminous and were written and sold by the Insurance Company Defendants, who should have copies of the policies.  In the event that the Insurance Company Defendants do not have copies of the policies, Plaintiffs will provide copies upon request.

29.   In prior years, Carnival had purchased two sets of first-party property insurance policies – one set of insurance policies to cover first-party property losses at its domestic locations, and another set of insurance policies to cover first-party property losses at its locations in Mexico.  For the 2005 renewal, however, Marsh suggested, among other things, that Carnival consolidate the domestic and Mexico coverages and obtain one set of global insurance policies that would provide Carnival with worldwide property insurance, including coverage for its Mexico properties.  Carnival requested, among other things, that Marsh implement these suggestions, and Marsh agreed to do so.

30.   Marsh purported to procure, and represented to Carnival that it did procure, an insurance program that consolidated Carnival's global risks into a master global insurance program (the "Carnival Global Property Insurance Program"), including Carnival's Mexico properties, to which each of the Insurance Company Defendants subscribed.

31.     Carnival paid substantial premiums to the Insurance Company Defendants as consideration for these insurance policies.

32.     The Carnival Global Property Insurance Program to which the defendants subscribed provides "all-risk" property insurance for damage and losses caused by events such as Hurricane Wilma.

33.     The insurance policy sold by IRI is a "Master Policy" that contains terms and conditions to which all of the Insurance Company Defendants agreed.

34.     The Carnival Global Property Insurance Program consists of essentially three different layers of coverage, as shown in Exhibit B hereto, and as described in the following Paragraphs.  In total, it provides $150,000,000 of insurance coverage.

35.     With respect to coverage for loss or damage to property located in Mexico, the Carnival Global Property Insurance Program was structured as described in Paragraphs 36 through 41 below.  Based on Carnival's present estimate of its total Hurricane Wilma Losses, only the first two layers of coverage are likely to be at issue in this action.

36.     The primary layer provides for $25,000,000 worth of coverage.  The understanding of the defendants and Carnival was that with respect to Carnival's property in Mexico, this coverage was provided by the Carnival Global Property Insurance Program (i) as direct reinsurers of an insurance policy (the "GNP Policy") issued by Grupo Nacional Provincial ("GNP"), a Mexican insurance company, to Cozumel Cruise Terminals ("CCT"), Carnival's wholly-owned Mexican subsidiary that owns Carnival's Mexican locations and Concessions, up to $23,734,000, the estimated value of those properties, and (ii) as direct insurers of all losses in excess of that estimated value amount.  GNP agreed to pay 60% of the losses covered by this policy; AIG Mexico covers the other 40% of those losses.  (GNP and AIG Mexico collectively are referred to herein as the "Mexican Insurance Companies.")  The GNP policy is directly

reinsured by defendants Lexington, Commonwealth, IRI, SCOR/General Security, and Arch. These defendants are required to fund any payments made under the GNP policy. The remaining $1,266,000 of the $25,000,000 primary layer is provided by these same defendants according to the percentage shares each agreed to assume for this layer.

37.    All of the defendants and Carnival understood and agreed that the Mexican Insurance Companies would be involved in this insurance program for purely technical reasons. With respect to losses covered by the GNP Policy, those Insurance Company Defendants with payment obligations up to the limits of the GNP Policy in fact would be responsible under their insurance policies for making all payments for losses up to the limits of the GNP Policy directly to the Mexican Insurance Companies, so that the Mexican Insurance Companies then could make payments to Carnival's subsidiary. Thus, Carnival is the real party in interest to all agreements and understandings between the Insurance Company Defendants and the Mexican Insurance Companies, and the Insurance Company Defendants knew and agreed to this.

38.    The second layer of coverage (or first-layer excess coverage) provides an additional $50,000,000 in coverage that is provided directly by defendants Illinois Union, Essex, Commonwealth, IRI, SCOR/General Security, and Arch. Their respective percentage shares for this layer are reflected in Exhibit B.

39.    The third layer of coverage (or second-layer excess coverage) provides an additional $75,000,000 in coverage that is provided directly by defendants Arch, Commonwealth, Illinois Union, IRI, and SCOR/General Security. Their respective percentage shares for this layer are reflected in Exhibit B.

40.    The GNP policy and each of the insurance policies sold by the Insurance Company Defendants provides coverage for loss and damage to Carnival's property subject to

the limits of liability stated in each of the respective policies. The policies also provide coverage for, among other things, lost rent, extra expense, and other time element losses.

41.    The policy numbers, periods, and limits of each of the insurance policies are identified in the schedule of insurance attached as Exhibit B, which is incorporated by reference as if fully set forth herein.

**Hurricane Wilma Destroys the Puerta Maya Pier Terminal
and Adjacent Property in Cozumel, Mexico**

42.    Prior to and during October 2005, Carnival, through CCT, held a property interest in the Puerta Maya Pier (the "Pier"), and in property adjacent to it (the "Puerta Maya Property"), in Cozumel, Mexico. Carnival rented out retail space on the Puerta Maya Property to various merchants. Cruise ships anchored and docked at the Pier, and tourists visited the shops and restaurants located on the Puerta Maya Property.

43.    On or about October 21 and 22, 2005, Hurricane Wilma destroyed the Pier and severely damaged the Puerta Maya Property that Carnival possessed in Cozumel, Mexico.

44.    Carnival also has suffered lost rent, extra expense, and other time element losses as a result of property damage caused by Hurricane Wilma. These losses are continuing.

45.    Carnival also has incurred other related costs and expenses that are covered by the various provisions of the insurance policies sold by the Insurance Company Defendants.

46.    The insurance policies sold by the Insurance Company Defendants obligate them to compensate Carnival for all of its Hurricane Wilma Losses, in accordance with the limits of liabilities in the policies.

47.    The Carnival Global Property Insurance Program was intended by Carnival and all of the defendants to provide coverage for the property damage caused by Hurricane Wilma at the Pier and the Puerta Maya Property.

48.   Carnival estimates that its Hurricane Wilma Losses, including lost rent, at the Pier and the Puerta Maya Property located in Mexico amount to approximately $60 million.

### Carnival's Notice to the Insurance Company Defendants of Its Hurricane Wilma Losses, and Their Response

49.   Carnival timely provided the Insurance Company Defendants with notice of its Hurricane Wilma Losses.

50.   Carnival also has provided, and continues to provide, the Insurance Company Defendants with information related to its claim, including Carnival's loss estimates.

51.   To date, almost two years after Carnival incurred, and informed the Insurance Company Defendants of, its Hurricane Wilma Losses, the Insurance Company Defendants have failed to recognize the full extent of their obligations under the insurance policies they sold to Carnival to pay for such losses, and they dispute Carnival's right to full payment of its Hurricane Wilma Losses.

52.   The Insurance Company Defendants together notified Carnival in a letter dated October 10, 2006, that they are proceeding under a full reservation of rights. In that letter, they all have reserved their rights specifically as to eight separate matters concerning coverage for Carnival's Hurricane Wilma Losses.

53.   Moreover, defendants Essex and SCOR/General Security have cited to particular insurance policy provisions – including a foreign territory exclusion, an occurrence limit of liability provision, a debris removal limitation, and an illegality provision – which they claim excuse them from paying for Carnival's Hurricane Wilma Losses. More specifically, they contend that their insurance policies do not provide coverage for losses incurred at foreign locations, such as Mexico.

54.   Consequently, as of this date, none of the Insurance Company Defendants has paid Carnival in full for its Hurricane Wilma Losses.

55.     The Insurance Company Defendants' failure to honor their obligations under the policies forced Carnival to commence this action to seek to recover amounts to which it is entitled under the insurance policies.

## COUNT I - **DECLARATORY JUDGMENT**

(Against All Insurance Company Defendants:  For Declaratory Relief)

56.     Carnival realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 55 as if fully set forth herein.

57.     The Insurance Company Defendants are obligated to pay for Carnival's Hurricane Wilma Losses under the insurance policies that they sold to Carnival.

58.     Carnival has complied with all terms and conditions contained in the insurance policies, except to the extent its performance has been or is excused by the Insurance Company Defendants' conduct.

59.     Carnival contends that no exclusions in the insurance policies bar coverage for any of its Hurricane Wilma Losses.

60.     The Insurance Company Defendants contest, have refused, or otherwise failed, to honor the totality of their obligations to pay for Carnival's Hurricane Wilma Losses.

61.     An actual and justiciable controversy currently exists between Carnival and the Insurance Company Defendants with respect to the Insurance Company Defendants' duties and obligations under the insurance policies, and the availability and scope of coverage for Carnival's Hurricane Wilma Losses.

62.     Carnival thus seeks a judicial determination that the Insurance Company Defendants must pay for Carnival's Hurricane Wilma Losses, and that because of the Insurance Company Defendants' conduct in refusing to acknowledge or to honor their coverage obligations, Carnival is excused from performing or complying with any conditions and duties

otherwise imposed on it by any of the insurance polices. A judicial determination is necessary at this time so the parties' dispute may be resolved and that the parties may be aware of their respective rights and duties.

## COUNT II - BREACH OF CONTRACT

(Against Essex and SCOR/General Security: For Breach of Contract)

63. Carnival reasserts the allegations of Paragraphs 1 through 62 as if fully set forth herein.

64. Essex and SCOR/General Security have anticipatorily breached the terms of the insurance policies that they sold to Carnival in the following ways:

      a.    They have failed adequately to investigate, or promptly to respond to, Carnival's demand for payment of Carnival's Hurricane Wilma Losses; and

      b.    They have asserted their refusal to pay for any of Carnival's Hurricane Wilma Losses.

65. As a direct and proximate result of Essex and SCOR/General Security's breach of contract, which is continuing at the date of this Complaint, Essex and SCOR/General Security have deprived Carnival of the benefit of the insurance coverage for which Carnival has paid substantial premiums.

66. As a direct and proximate result of Essex and SCOR/General Security's breach of contract, Carnival has sustained and will continue to sustain substantial monetary damages, including substantial unreimbursed property losses, including the costs of cleaning up, repairing, replacing, and rebuilding damaged or destroyed property, and lost rent, extra expense, and other time element losses, as well as attorney's fees associated with bringing this action for coverage.

## COUNT III - <u>BREACH OF CONTRACT</u>

(Against Marsh:  For Breach of Contract)

67.      Carnival repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68.      Pursuant to the Agreement between Carnival and Marsh, attached as Exhibit A, Marsh agreed to obtain the insurance coverage Carnival requested and required.

69.      The Agreement obligated Marsh, among other things:

    a.      to work with Carnival to assess Carnival's risks;

    b.      to work with Carnival to design and develop Carnival's insurance program;

    c.      to help Carnival with the documentation and other steps to obtain commitments for and implement Carnival's global insurance program, and to perform these functions upon Carnival's instructions;

    d.      to review the policies and endorsements for accuracy and conformity to specifications and negotiated coverage;

    e.      to provide coverage summaries for all new coverage and updates on changes to existing coverage;

    f.      to assist Carnival in connection with issues relating to interpretation of insurance policies placed by Marsh;

    g.      to develop a mutually agreeable renewal action plan and timeline that highlights accountability and meets Carnival's objectives; and

    h.      to provide all services in a professional and timely manner consistent with industry standards and in compliance with applicable laws.

70.      Carnival has complied with all terms and conditions contained in the Agreement, except to the extent its performance has been or is excused by Marsh's conduct.

71.      If the Court finds that any of the Insurance Company Defendants' insurance policies do not provide full coverage for Carnival's Hurricane Wilma Losses, then Marsh breached its obligations under the Agreement by, among other things:

a.    not procuring the global insurance coverage that Carnival requested and required;

b.    not informing Carnival that it had failed to procure the requisite insurance coverage; and

c.    depriving Carnival of the opportunity to purchase such coverage from other sources.

72.    To the extent that the Court finds that any of the insurance policies do not provide full coverage for Carnival's Hurricane Wilma Losses, then it should find that Marsh breached its contract with Carnival, thereby directly and proximately causing Carnival to suffer substantial monetary damages, including substantial unreimbursed property losses, including the costs of cleaning up, repairing, replacing, and rebuilding damaged or destroyed property, and lost rent, extra expense, and other time element losses, as well as attorney's fees associated with bringing this action for coverage.

73.    Marsh also breached its contract with Carnival by failing to take necessary and appropriate steps to ensure that Carnival would not need to enforce its contractual rights to coverage through dispute resolution, thereby causing Carnival to suffer substantial monetary damages, including significant fees and expenses in pursuing its rights to coverage.

## COUNT IV - **BREACH OF FIDUCIARY DUTY**

(Against Marsh: For Breach of Fiduciary Duty)

74.    Plaintiff Carnival repeats and realleges paragraphs 1 through 73 as if fully set forth herein.

75.    Marsh owed Carnival a fiduciary duty because of the inherent trust and confidence that Carnival, as a policyholder, placed in Marsh, its insurance broker.

76.    The fiduciary relationship between Marsh and Carnival obligated Marsh, among other things:

a.    to secure the insurance coverage that Carnival requested and required;

b.    to fully and completely explain the material terms of the insurance coverage;

c.    to fully and completely inform Carnival of all material facts within Marsh's knowledge that may affect the transaction or the subject matter of the relationship;

d.    to fully and completely inform Carnival if Marsh had been unable to secure the coverage that Carnival requested and required; and

e.    to provide all services in a professional and timely manner consistent with industry standards and in compliance with applicable laws.

77.    Marsh also promised to secure and gave assurances that it did secure the insurance coverage that Carnival required and requested.

78.    To the extent that the Court finds that any of the insurance policies do not provide full coverage for Carnival's Hurricane Wilma Losses, then it should find that Marsh breached the fiduciary duty it owed Carnival, thereby directly and proximately causing Carnival to suffer substantial monetary damages, including substantial unreimbursed property losses, including the costs of cleaning up, repairing, replacing, and rebuilding damaged or destroyed property, and lost rent, extra expense, and other time element losses, as well as attorney's fees associated with bringing this action for coverage.

79.    Marsh also breached its fiduciary duty to Carnival by failing to take necessary and appropriate steps to ensure that Carnival would not need to enforce its contractual rights to coverage through dispute resolution, thereby causing Carnival to suffer substantial monetary damages, including significant fees and expenses in pursuing its rights to coverage.

## COUNT V – <u>NEGLIGENT FAILURE TO PROCURE</u>

(Against Marsh: For Negligence)

80.    Plaintiff Carnival repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81.     Marsh had a duty to exercise reasonable skill, care, diligence, and good faith in, among other things:

    a.    securing the insurance coverage that Carnival requested and required;

    b.    fully and completely explaining the material terms of the insurance coverage;

    c.    fully and completely informing Carnival of all material facts within Marsh's knowledge that may affect the transaction or the subject matter of the relationship;

    d.    fully and completely informing Carnival if Marsh had been unable to secure the coverage that Carnival requested and required; and

    e.    providing all services in a professional and timely manner consistent with industry standards and in compliance with applicable laws.

82.     To the extent that the Court finds that any of the insurance policies sold by the Insurance Company Defendants do not provide full coverage for Carnival's Hurricane Wilma Losses, Marsh has failed to comply with, and thus breached, its duty to Carnival by, among other things:

    a.    obtaining terms of coverage that did not conform to, and were contrary to, Carnival's desires and requirements;

    b.    failing to procure the insurance coverage that Carnival requested and required;

    c.    depriving Carnival of the opportunity to purchase the insurance that it had requested and required, and to obtain coverage otherwise available; and

    d.    not providing all of its services in a professional and timely manner consistent with industry standards and in compliance with applicable laws.

83.     To the extent that the Court finds that any of the insurance policies do not provide full coverage for Carnival's Hurricane Wilma Losses, then it should find that as a direct and proximate result of Marsh's breach, Carnival has suffered substantial monetary damages, including substantial unreimbursed property losses, including the costs of cleaning up, repairing,

replacing, and rebuilding its damaged or destroyed property, and lost rent, extra expense, and other time element losses, as well as attorney's fees associated with bringing this action for coverage.

84.   Marsh also was negligent in failing to take necessary and appropriate steps to ensure that Carnival would not need to enforce its rights through dispute resolution, thereby causing Carnival to suffer substantial monetary damages, including significant fees and expenses in pursuing its rights.

## COUNT VI- <u>NEGLIGENT FAILURE TO INFORM</u>

### (Against Marsh:  For Negligence)

85.   Plaintiff Carnival repeats and realleges paragraphs 1 through 84 as if fully set forth herein.

86.   Marsh had a duty to exercise reasonable skill, care, diligence, and good faith in, among other things:

     a.    securing the insurance coverage that Carnival requested and required;

     b.    fully and completely explaining the material terms of the insurance coverage;

     c.    fully and completely informing Carnival of all material facts within Marsh's knowledge that may affect the transaction or the subject matter of the relationship;

     d.    fully and completely informing Carnival if Marsh had been unable to secure the coverage that Carnival requested and required; and

     e.    providing all services in a professional and timely manner consistent with industry standards and in compliance with applicable laws.

87.   To the extent that the Court finds that any of the Insurance Company Defendants' insurance policies do not provide full coverage for Carnival's Hurricane Wilma Losses, Marsh has failed to comply with, and thus breached, its duty to Carnival by, among other things:

a.  failing to inform Carnival that Marsh did not procure the insurance coverage that Carnival required and requested;

b.  failing to inform Carnival that the Insurance Company Defendants would not provide full coverage for Carnival's Hurricane Wilma Losses;

c.  depriving Carnival of the opportunity to purchase the insurance that it had requested and required, and to obtain coverage otherwise available; and

d.  not providing all of its services in a professional and timely manner consistent with industry standards and in compliance with applicable laws.

88.  To the extent that the Court finds that any of the insurance policies do not provide full coverage for Carnival's Hurricane Wilma Losses, then it should find that as a direct and proximate result of Marsh's breach, Carnival has suffered substantial monetary damages, including substantial unreimbursed property losses, including the costs of cleaning up, repairing, replacing, and rebuilding its damaged or destroyed property, and lost rent, extra expense, and other time element losses, as well as attorney's fees associated with bringing this action for coverage.

89.  Marsh also was negligent in failing to take necessary and appropriate steps to ensure that Carnival would not need to enforce its rights through dispute resolution, thereby causing Carnival to suffer substantial monetary damages, including significant fees and expenses in pursuing its rights.

## COUNT VII - NEGLIGENT MISREPRESENTATION

(Against Marsh:  For Negligence)

90.  Plaintiff Carnival repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.  Marsh had a duty to exercise reasonable skill, care, diligence, and good faith in, among other things:

a.    securing the insurance coverage that Carnival requested and required;

b.    fully and completely explaining the material terms of the insurance coverage;

c.    fully and completely informing Carnival of all material facts within Marsh's knowledge that may affect the transaction or the subject matter of the relationship;

d.    fully and completely informing Carnival if Marsh had been unable to secure the coverage that Carnival requested and required; and

e.    providing all services in a professional and timely manner consistent with industry standards and in compliance with applicable laws.

92.    Marsh also gave Carnival assurances that it did secure the insurance coverage that Carnival required and requested. Carnival reasonably relied on those assurances.

93.    To the extent that the Court finds that any of the insurance policies sold by the Insurance Company Defendants do not provide full coverage for Carnival's Hurricane Wilma Losses, Marsh has failed to comply with, and thus breached, its duty to Carnival by, among other things:

a.    misrepresenting to Carnival the scope of coverage afforded by the 2005-2006 insurance policies;

b.    falsely assuring Carnival that it had provided Carnival with the coverage Carnival required and requested, when in fact Marsh did not secure such coverage;

c.    deceiving Carnival about the scope of coverage afforded by the 2005-2006 insurance policies; and

d.    not providing all of its services in a professional and timely manner consistent with industry standards and in compliance with applicable laws.

94.    To the extent that the Court finds that any of the insurance policies do not provide full coverage for Carnival's Hurricane Wilma Losses, then it should find that as a direct and proximate result of Marsh's breach, Carnival has suffered substantial monetary damages, including substantial unreimbursed property losses, including the costs of cleaning up, repairing,

replacing, and rebuilding its damaged or destroyed property, and lost rent, extra expense, and other time element losses, as well as attorney's fees associated with bringing this action for coverage.

95.     Marsh also was negligent in failing to take necessary and appropriate steps to ensure that Carnival would not need to enforce its rights through dispute resolution, thereby causing Carnival to suffer substantial monetary damages, including significant fees and expenses in pursuing its rights.

## PRAYER FOR RELIEF

WHEREFORE, Carnival requests a judgment against the defendants as follows:

a.      On Count I, that this Court determine and declare that the Insurance Company Defendants are obligated under the insurance policies to pay for Carnival's Hurricane Wilma Losses, subject to policy limits;

b.      On Count II, against defendants Essex and Illinois Union, for damages in an amount to be determined at trial;

c.      On Counts III to VII against defendant Marsh for damages in an amount to be determined at trial;

d.      On all claims for relief, for reasonable attorney's fees, interest, costs, and the expenses of this action as provided for by Section 627.428 of the Florida Statutes, and otherwise; and

e.      For such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

**CARNIVAL REQUESTS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated:  June 18, 2007
Miami, Florida

Respectfully Submitted,

**CARNIVAL CORPORATION AND CARNIVAL PLC**

Robert T. Wright, Jr., Esq.,
Florida Bar No. 185525
rwright@coffeyburlington.com
Robert K. Burlington, Esq.
Florida Bar No. 261882
rburlington@coffeyburlington.com
Gabriel Groisman, Esq.
Florida Bar No. 25644
ggroisman@coffeyburlington.com
**COFFEY BURLINGTON, PL**
Counsel for Plaintiffs
2699 South Bayshore Drive, Penthouse
Miami, FL  33133
Tel.   (305) 858-2900
Fax:  (305) 858-5261


Of Counsel:
**DICKSTEIN SHAPIRO LLP**
Barry J. Fleishman, Esq.
fleishmanb@dicksteinshapiro.com
Erica J. Dominitz, Esq.
dominitze@dicksteinshapiro.com
1825 Eye Street, NW
Washington, DC 20006-5403
Tel:  (202) 420-2200
Fax:  (202) 420-2201

# **EXHIBIT A**

## Client Service Agreement
### by and among
### Marsh USA Inc.,
### Carnival Corporation and Carnival plc

AGREEMENT, dated as of October 1, 2004, among Carnival Corporation, a Panamanian corporation, Carnival plc, a UK corporation (Carnival Corporation and Carnival plc to be collectively referred to as the "Client") and Marsh USA Inc., a Delaware corporation ("Marsh").

It is agreed as follows:

1. **Services.** During the term of this Agreement, Marsh shall be engaged as the Client's insurance, risk management and risk financing advisor and insurance broker with respect to the Non-Marine lines of insurance coverage as listed on Exhibit A and shall perform the following services for the Client (the "Services").

   a. Work with the Client to assess the Client's risks;

   b. Work with the Client to design and develop the Client's insurance program;

   c. Identify and negotiate on the Client's behalf with insurers and keep the Client informed of significant developments. Marsh shall be authorized for purposes of this Agreement to represent and assist the Client in all discussions and transactions with all insurers, provided that Marsh shall not place any insurance on behalf of the Client unless so authorized by the Client in writing;

   d. Assist with documentation and other steps to obtain commitments for and implement the Client's insurance program upon the Client's instructions, it being understood that Marsh will not independently verify or authenticate Client-provided information necessary to prepare underwriting submissions and other documents relied upon by insurers, and the Client shall be solely responsible for the accuracy and completeness of such information and other documents provided by Client to Marsh and/or insurers and shall sign any application for insurance. The Client understands that the failure to provide all necessary information to an insurer, whether intentional or by error, could result in the impairment or voiding of coverage. However, Marsh will use its best efforts to prepare insurance specifications for review and approval by Client 90 days prior to each renewal date;

   e. Use its best efforts to place insurance on behalf of the Client, if so instructed in writing by the Client. However, Marsh does not guarantee or make any representation or warranty that insurance can be placed on terms acceptable to the Client;

   f. Monitor published financial information of the Client's current insurers and as soon as reasonably practicable alert the Client when the status of one or more of such insurers falls below Marsh's minimum financial guidelines. Marsh will not, however, be responsible for the solvency of any insurance carrier or its ability or willingness to pay claims, return premiums or other financial obligations. Insurers with whom the Client's risks have been placed will be deemed acceptable to the Client, in the absence of contrary instructions from the Client;

   g. Follow up with insurance carriers for timely issuance of policies and endorsements;

   h. Review policies and endorsements for accuracy and conformity to specifications and negotiated coverages;

   i. Provide coverage summaries for all new coverages and updates on changes to existing coverages;

   j. In certain cases, placements which Marsh makes on the Client's behalf may require the payment of insurance premium taxes (including U.S. federal excise taxes), sales taxes, use taxes, surplus

MMC  Marsh & McLennan Companies

or excess lines and similar taxes and/or fees to federal, state or foreign regulators, boards or associations. The Client will pay such taxes and fees, whenever appropriately assessed. Such taxes and fees will be identified by Marsh on invoices covering these placements. Any such taxes and fees collected by Marsh will be promptly remitted by Marsh to the appropriate authorities;

k.  Utilize the services of other intermediaries to assist in the marketing of the Client's insurance (including brokers in the London and other markets), when in Marsh's professional judgment those services are necessary or appropriate, subject in each case to Client's prior written approval. Such intermediaries may be affiliates of Marsh or not related to Marsh. The compensation of any unaffiliated intermediaries is not included in Marsh's compensation under this Agreement and will be paid by insurers out of paid premiums subject to full disclosure and Client's prior written approval;

l.  Keep the Client informed of significant changes and/or trends in the insurance marketplace and provide the Client with an annual forecast of market conditions;

m.  Following placement, deliver binders prior to the expiration of the Client's current policies;

n.  Process or facilitate the processing of certificates of insurance, bonds and auto identification cards with respect to insurance policies placed by Marsh, as requested by the Client;

o.  Review audits, rating adjustments, dividend calculations and loss data;

p.  Provide the Client with detailed invoices, except in the case of direct billing by insurers;

q.  Assist the Client in establishing claims reporting procedures;

r.  Consult with the Client regarding specific claims and conduct a Casualty Claims loss review as outlined in Marsh's proposal of June 2004;

s.  Follow-up with insurers with respect to timely collection of claims and with respect to the payment of return premiums;

t.  Act as a liaison between the Client and insurers;

u.  Assist the Client in connection with issues relating to interpretation of insurance policies placed by Marsh;

v.  Conduct strategic planning sessions to review current performance and establish future objectives and strategies for the Client's risk and insurance program;

w.  Effective upon the renewal or placement by Marsh of the Client's excess insurance program, unless the Client gives the Marsh client executive contrary instructions in writing, whenever the Marsh client executive is informed in writing by the Client that a claim has been notified to the primary carrier Marsh will notify all applicable excess carriers where Marsh has placed the applicable excess policies or the Marsh client executive has been provided written notice by the Client of the applicable carrier and policies. If Marsh is instructed not to provide notice to any excess carrier, Marsh shall have no responsibility for any consequences arising out of the failure to give notice;

x.  Develop a mutually agreeable renewal action plan and timeline that highlights accountability and meets the Client's objectives; and

y.  Meet regularly with the Client's key people designated by the Client's Risk Manager to discuss strategy and open items.

If Marsh has taken over any existing program or policies implemented by another broker, Marsh will not assume any responsibility for the adequacy or effectiveness of those programs or policies or any actions or omissions occurring prior to Marsh's retention. Within a reasonable period of time, but in no event later than 60 days from the date hereof, Marsh will have completed a review of those programs and policies and will make recommendations it believes are necessary.

2

Marsh does not speak for any insurer, is not bound to utilize any particular insurer, and does not have the authority to make binding commitments on behalf of any insurer.

Marsh will provide all such Services to Client in a professional and timely manner consistent with industry standards and in compliance with applicable laws. All such Services shall be provided directly by or under the direct guidance of highly trained and knowledgeable professionals within the insurance industry as retained by Marsh to work on Client's account. In negotiating insurance coverage and pricing, Marsh shall not take any position contrary to or in conflict with the interest of Client and shall immediately disclose to Client, in writing, any circumstance that may reasonably be considered a conflict of interest. The following individuals will serve as Marsh's primary contacts to Client during the term of this Agreement. In the event either of such individuals is no longer servicing Client's account, any replacement of the individuals listed below shall be subject to Client's prior approval not to be unreasonably withheld.

Gina Thom, Vice President, 1-954-838-3444
Eileen S. Yodanis, Vice President, (954) 838-3484
Marsh USA Inc.
1560 Sawgrass Corporate Parkway
Suite 300
Sunrise, FL 33345-9010

Nothing herein shall grant to Marsh any exclusive rights to act on behalf of Client on insurance matters. Client may seek and obtain insurance, risk management and risk financing advisory and insurance broker services from any third party for any type of insurance coverage except with respect to the Non-Marine lines of insurance coverage as listed on Exhibit A. Marsh shall be liable to and indemnify Client for Marsh's, including its employees, negligence or willful misconduct in the performance of the Services hereunder.

Any loss control activities and/or surveys performed by Marsh under this Agreement are advisory in nature. Such services are limited in scope, do not claim to find or include every loss potential, hazard, statutory or code violation or violation of good practice, and do not constitute a safety inspection as provided by a safety engineering service. All surveys and reports are based upon conditions observed and information supplied by Client. Marsh does not expressly or impliedly guarantee, assure or warrant in any way the safety of any site or operations or that Client or any site or operations is in compliance with federal, state and local laws, codes, statutes, ordinances and recommendations. Marsh's liability if any, relating to or arising out of Marsh's loss control services for the Client shall not exceed the total compensation paid to Marsh under this Agreement for such services hereunder.

2.    Compensation.

Fee Based Income

Marsh will deliver the Services as outlined in this Agreement for an annual fee of $354,500, payable and to be invoiced on an annual basis (the "Annual Fee") on October 1st of each year. The fee will increase 5% annually in the second and third year so long as the scope of services do not change. With respect to insurance placed by Marsh on the Client's behalf, Marsh will disclose, in writing, to the Client any commissions or other payments, fees or charges received by Marsh, credit them against the annual fee for subsequent years and, to the extent in excess of the remaining annual payments, refund previously paid installments of the fee. In the event such commissions or other payments for a contract year exceed Marsh's annual fee for that year, then, at the option of Client, the excess commissions/payments will be returned to the Client, if permitted by applicable law. Otherwise, the excess commissions/payments will be carried forward and applied against Marsh's annual compensation for subsequent years.

The Annual Fee above represents the total fees, costs and charges payable to Marsh by Carnival in performance of the Services hereunder including, without limitation, all out of pocket expenses, administrative and office charges and travel costs incurred by Marsh. No other fees, costs or expenses shall be payable by Client for the Services provided hereunder.

3

In the event there is a significant change in the Client's operations which affects the nature and scope of its insurance program, Marsh and the Client both agree to renegotiate Marsh's compensation in good faith as appropriate.

3.   Term.

The term of this Agreement shall commence October 1, 2004 and shall terminate October 1, 2007. Each 12-month period between October 1 and September 30 during the term shall be referred to herein as a "Contract Year".

The term may be extended by mutual written agreement of the parties. In the event of termination, Marsh will assist the Client in arranging a smooth transition process. However, Marsh's obligation and the obligation of its affiliates to provide services to the Client will cease upon the effective date of termination, unless otherwise agreed in writing.

Notwithstanding the term of this Agreement, either party, may terminate this Agreement during any Contract Year upon ninety (90) days prior written notice to the other party.  In the event of termination by the Client prior to expiration of the full term, Marsh's compensation set forth in Section 2 for the Contract Year  will be deemed earned in accordance with the following schedule, for services performed through the termination date:

> 60% at commencement of Contract Year
> 75% after four months
> 100% after seven months

No other payments to Marsh will be due or payable upon such termination.   In the event of termination by Marsh prior to expiration of the full term, Marsh's compensation set forth in Section 2 shall be pro-rated based on the number of months Services here provided up to the termination date over the remaining months in such Contract Year.

4.   Additional Services.

Additional services are available for additional compensation and subject to the negotiation of separate agreements between Marsh and Client.  Such services may include, but are not limited to:

* Consulting relating to work force strategies, including behavioral risk management, absence management, cumulative injury management, financial diagnostics and custom risk and insurance solutions;
* Business interruption and other claims valuation services offered by Marsh's CAPS Claims Accounting and Preparation Services practice;
* Environmental risk consulting services;
* Operations and assets consulting services, including business continuity management, supply chain risk management, loss control and engineering support services and strategic risk assessments;
* Risk management claims information systems, including Marsh's STARS and TrendTracker software programs, and related services;
* Claims services other than those specified above, including catastrophic claims, mass tort claims, and archival research;
* Services in connection with loss portfolio transfers and alternative risk financing;
* Establishment and administration of captive insurers;
* Non-recurring insurance placements involving significant quantitative or actuarial analysis or modeling, placements of risks with financial institutions other than insurance carriers, and placements of risks not customarily accepted by insurers;
* Actuarial services;
* Employee benefits services;

4

- Insurance-related mergers and acquisition due diligence services; and
- Interactive on-line client services.

5.   **Books and Records.**

The Client is entitled to copies of reports and/or documents relating to its account (other than internal correspondence) including, without limitation, materials and documents concerning commissions, fees or other payments received by Marsh during the term of the Agreement affecting the compensation paid hereunder. However, files (other than copies of insurance policies) will not be retained for more than five years after the expiration of a particular policy's term.

6.   **Governing Law.**

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to its conflicts of law provisions. Any and all disputes under this Agreement shall be brought, if at all, in the courts located in Miami-Dade County, Florida, to the exclusion of any other court.

7.   **Miscellaneous.**

This Agreement contains the entire understanding of the parties with respect to the subject matter contained herein, superseding all prior agreements, understandings and negotiations with respect to such matters. This Agreement may be modified or otherwise amended and the observance of any term of this Agreement may be waived, only if such modification, amendment or waiver is in writing and signed by the party to be charged with same. This Agreement shall be binding upon and inure to the benefit of the parties' respective successors. Neither party shall assign this Agreement without the prior written consent of the other party. In the event Marsh is sold or management control of Marsh is transferred to a third party, Client may terminate this Agreement upon ten (10) days notice. Neither party shall have any liability for any failure or delay in performance of its obligations under this Agreement because of circumstances beyond its reasonable control, including without limitation, acts of God, fires, floods, earthquakes, acts of war or terrorism, civil disturbances, sabotage, accidents, unusually severe weather, governmental actions, power failures, computer/network viruses that are not preventable through generally available retail products, catastrophic hardware failures or attacks on its server.

Marsh USA Inc.

By: _____     Date: 1/3/06

Gina Thom
Vice President

ACCEPTED AND AGREED:

**Carnival Corporation**
on behalf of itself and Carnival plc

By: _____     Date: 12/29/05

Gerald R. Cahill
Chief Financial and Accounting Officer

5

Exhibit A

Property
Boiler & Machinery
General Liability
Marine Terminal Operator's Liability
Foreign Liability
Business Auto Including Motorcoach Liability
Worker's Compensation
Umbrella Liability
Directors and Officers Liability
Fiduciary Liability
Crime
Special Risk
Aircraft Hull & Liability
Non-owned Aviation Liability
Storage Tank Liability
Environmental Impairment
Employment Practices Liability
Surety Bonds

6

## Carnival Corporation
### Total Insured Values per Brand

| Brand | Buildings/ Improvements | Contents | Stock/ Inventory | EDP | Other | Bus. Int./ Extra Expense | T.I.V. |
|---|---|---|---|---|---|---|---|
| Carnival | $155,022,539 | $18,628,596 | $6,457,283 | $55,596,243 | $29,500,000 | $9,884,000 | $275,088,661 |
| Costa | $0 | $1,000,000 | $0 | $0 | $0 | $200,000 | $1,200,000 |
| Cunard | $2,220,000 | $120,000 | $0 | $0 | $0 | $0 | $2,340,000 |
| Holland America | $163,258,393 | $25,284,755 | $0 | $7,705,000 | $29,000,000 | $0 | $225,248,148 |
| Princess | $213,797,000 | $68,894,325 | $0 | $0 | $33,595,000 | $67,418,600 | $383,704,925 |
| Totals | $534,297,982 | $113,927,676 | $6,457,283 | $63,301,243 | $92,095,000 | $77,502,600 | $887,581,734 |

** Other Includes Rail Cars, Motorcoaches and the Grand Turks & Caicos Builders Risk Project

# **EXHIBIT B**

### Schedule of Insurance Policies

(Center)

| Insurance Company | Policy Number | Policy Period | Participation | Policy Limits |
|---|---|---|---|---|
| IRI | 31-3-70785 | 5/1/05-5/1/06 | 16.5% p/o $150,000,000 | $24,750,000 p/o $150,000,000 |
| Lexington | 8754113 | 5/1/05-5/1/06 | 40% p/o $25,000,000 | $10,000,000 p/o $25,000,000 |
| Commonwealth | US 5689 | 5/1/05-5/1/06 | 18.5% p/o $25,000,000 | $4,625,000 p/o $25,000,000 |
| | US 5690 | 5/1/05-5/1/06 | Alaska only | Alaska only |
| | US 5691 | 5/1/05-5/1/06 | 6% p/o $50,000,000 xs $25,000,000 | $3,000,000 p/o $50,000,000 xs $25,000,000 |
| | US 5692 | 5/1/05-5/1/06 | 20% p/o $75,000,000 xs $75,000,000 | $15,000,000 p/o $75,000,000 xs $75,000,000 |
| Arch Specialty | PRP 000 7453 00 | 5/1/05-5/1/06 | 10% p/o $150,000,000 | $15,000,000 p/o $150,000,000 |
| | | | 20% p/o $75,000,000 xs $75,000,000 | $15,000,000 p/o $75,000,000 xs $75,000,000 |
| SCOR/General Security | 25F39000197-05 | 5/1/05-5/1/06 | 15% p/o $150,000,000 | $22,500,000 p/o $150,000,000 |
| Illinois Union | D3590427A 001 | 5/1/05-5/1/06 | 27.5% p/o $50,000,000 xs $25,000,000 | $13,750,000 p/o $50,000,000 xs $25,000,000 |
| | D35904232 001 | 5/1/05-5/1/06 | 18.5% p/o $75,000,000 xs $75,000,000 | $13,875,000 p/o $75,000,000 xs $75,000,000 |
| Essex | ESP3446 | 5/1/05-5/1/06 | 25% p/o $50,000,000 xs $25,000,000 | $12,500,000 p/o $50,000,000 xs $25,000,000 |

We refer to
them on
pg 3 as "Arch"

JS 44   (Rev. 11/05)

# CIVIL COVER SHEET

# 07-21543

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## CV-HOEVELER

### I. (a) PLAINTIFFS

CARNIVAL CORPORATION and CARNIVAL PLC

**(b)** County of Residence of First Listed Plaintiff   Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Robert T. Wright, Jr., Esq. and Gabriel Groisman, Esq., Coffey Burlington, PL, 2699 South Bayshore Drive, PH, Miami, FL 33133; Phone: (305) 858-2900

### DEFENDANTS

INDUSTRIAL RISK INSURERS, LEXINGTON INSURANCE COMPANY, COMMONWEALTH INSURANCE COMPANY, +

County of Residence of First Listed Defendant   Hartford
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

## MAGISTRATE JUDGE

Attorneys (If Known)

Christopher B. Kende, Christopher Raleigh, Ozen O'Connor, Counsel for Essex Insurance Company   + **BROWN**

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

*Miami - 07cv21543 WMH STO*

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☑ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☑ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

### V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO   b) Related Cases ☑ YES ☐ NO

JUDGE Castel     DOCKET NUMBER 07 CIV 4653

### VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

LENGTH OF TRIAL via 10 days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $   IN EXCESS OF $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE   June 18, 2007

FOR OFFICE USE ONLY

AMOUNT 350   RECEIPT # 961706   IFP

JS 44 Reverse (Rev. 11/05)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

(d) Choose one County where Action Arose.

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Refiled Copy of Order of Dismissal. (3)

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**VII.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**       Example:         U.S. Civil Statute: 47 USC 553
                                                            Brief Description: Unauthorized reception of cable service

**VIII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature.** Date and sign the civil cover sheet.